The next case is Stein v. American General Life Insurance Company. Good morning. Good morning, Your Honors. May it please the Court, my name is Ira Lipsius of Lipsius-Pottheim Law. I represent the plaintiff and appellant, Alan Stein, as trustee of the Rachel Meisels Irrevocable Trust. I think there's a couple of key issues here. There's a lot of little issues that all add up to the bottom line as to the efficacy of the notices. I think, and I'd like to just raise one thing. It's interesting that there's a major fact here that I believe AIG realizes is a problem, and that's why throughout their brief they have misstated it. The notice specifically says that the money must be received prior to July 20th, 2009. Interestingly enough, in AIG's brief, they go through this and they keep on misstating it. Page 16, the notice expressly listed July 20th, 2009. They leave out the word prior. Page 12, required by July 20th, 2009. Yeah. What difference does that make? Okay. Because prior to, there's two issues here and why it's a big difference. When I tell you it has to be prior to July 20th, that means July 19th. Yeah. What difference does it make? They never sent a payment, ever. That's correct. Well, they never received the notice. But I believe the standard as applied by the courts in New York is that there is strict compliance, and that we can get into. But this is even more than that. We're talking about it also says it has to be received by, interestingly enough. And, in fact, it means it has to be mailed by, as we discussed in our brief, and nowhere did they refute that the law is that it has to be mailed by. So let's talk about July 20th as a Monday. In order for that to have been received by, they would have had to mail it five, six days before. So the notice is May 18th. It's two months before. That's not such a big burden, is it? Well, people have to get their monies together. You have your mortgage. You have payments. It's got to be due by such a date. You send it out a few days ahead of time, as long as you've got plenty of notice. This is two months before. It's not like July 15th they sent this to them. That's correct. But they are now still giving them. People have to put their money together. People have other reasons. And there is a strict compliance. The idea is there's a public policy in this State against having policies lapse and default. And we discussed those cases. Of the public policy, this statute is about giving notice so that a policy will not lapse because the person doesn't know that the premium is due. Correct, Your Honor. So why would a difference of a day or two or three be material? Well, I believe it's because I believe it really comes out to four or five days because not only is it the prior issue, but it's also the issue of the mailing issue. It says receive versus mailing. By law, they could have mailed it on the 20th. That's what the 20th. Instead, they're — You were asked whether it was material. And I take it your point is New York Court of Appeals isn't concerned with the materiality of the noncompliance. They're only concerned with whether there's noncompliance. That is correct. And this Court, specifically in speciale, said we have strict compliance. This Court in itself — Wouldn't your argument be different if, say, you had mailed it on July 20th and they said it's not good enough, it's supposed to be received, and you say, well, three days later you got it? That's a different argument, isn't it? A hundred percent. Well, part of the problem is my client never received it, and I'll go in — That's another issue. Okay. But I'll go into that. Well, let me just take one step. See, I don't understand why you give away your case that way. Your argument wouldn't be any better. Your argument would be identical because your argument is New York requires strict compliance, and there wasn't. So whether the letter was received a day before, three days before, a month before, or a day late doesn't affect your argument, which is that New York requires strict compliance. Correct, Your Honor. A hundred percent. Now, let's talk about one of the issues of the witnesses. And I think this is a very, very important issue, Your Honor. The witness we have here is a guy from Pitney Bowes. And let's take the history, and it's in the record, and they come forward with their Rule 26, and they don't — Suzuki you're talking about? Correct. And they list — and they do not list any witness from the mailing center whatsoever. And when they come on motions for summary judgment, we come forward and say, under the rules of this Court, if you haven't listed the witness, you can't give an affidavit from a witness you don't have listed, and you've listed no one who knows what happened in the mailing. So the Court allows the deposition to be taken. They say, we want to do a new witness. The Court says, you have to pay the actual attorney's fees for my firm to go down there to Texas to take this deposition. We get attorney's fees, costs, et cetera. And who do they give? They give a witness who has never been at the facility. Now, it's interesting. In their brief, they say, its witness was not physically stationed at the facility on the day of the notice. They keep on saying that, page 10, page 21, on and on in their brief. The problem is he was never at that facility. He worked at a different facility. He had — cannot — he can tell you all about the procedures of the company. We agree. And that's why we admitted what we did in the Rule 56. That is the procedure, whether he followed it or not. If we would come to a clerk in this Court and say, what's the procedures for receiving mail, and the clerk would say, in all Federal district courts in the Second Circuit, this is the procedure. But if the issue was what they did in the United States district court in Vermont, and that person had never been there, procedures are great, but the law requires — and there's the Luna case in the First Department, which I actually argued, and we reversed the decision of a Supreme Court judge. Specifically, the person has to know the procedure that took place in that facility. He never was there. He worked at three other facilities. Therefore, that's a major issue. They have no witness who has ever testified as to the procedure that took place in the facility that sent it. And what do you have? Well, the burden is upon them to show the mailing, and the burden is specifically Did you ask to depose anyone who — We did. We asked them to depose a corporate designee. That's what happened. What happened is they came forward to Rule 26, and we said — and they made a motion, and they had two — But why isn't it a reasonable inference that if these are the procedures throughout, then this is the procedure in this particular office? But the concept is you want to know that that procedure was filed. I could have the greatest procedures in five offices. I don't understand that. No one knows whether the procedure was followed in a particular case. That's why evidence like this is accepted. So you don't get — you never get somebody to say, yeah, on — as with respect to this letter, this is what we did, because no one knows what happened to that letter. But you have to know the procedure was generally followed in the facility. There is no witness whatsoever who was at that facility and knew the issues of — if there were any issues. Let me ask you about that. You said he never worked in Houston. Is that what you said this morning? He never worked at that facility. Is that Houston? Houston, correct. He worked at three other facilities, and they put it right in their brief that he worked at three other facilities. Let me just ask questions, okay? But he testified that he did work in Houston, but it was after this time, right? That's correct. So you said he never worked at Houston? As of the date of this mailing. That's what you said. Yes. So therefore — But then he — and then he said he had firsthand knowledge of the procedures at all those facilities that were mailing facilities. He did testify about that, right? Correct. How was it different in Houston? Did anybody say, well, is it different in Houston? And that would be a material difference? Well, I think the burden is set forth by the New York courts and the appellate courts in New York is the person — and in the Luna case was exactly this. The man started working at that facility a month after the letter was sent out. But this guy said he worked at three mailing facilities. The procedures were all the same. I later on worked at Houston. It was the same as the other two places, and they followed it. But he has no idea what was happening. He found a copy. He had a copy of the actual notice. And he had another affidavit from somebody else who said, yeah, we actually retained a copy of the grace notice, right? Well, that's a computer notice. It doesn't say what's mailing. The issuance of letters is one thing. The mailing is the other. And there is no witness. And they were given the opportunity. The judge said, get someone who knows that facility. Why is it that they didn't bring somebody? When the judge gave them that opportunity and gave us costs to get that witness, why is it that they did not even mention and bring someone who worked at that facility? There has to be a reason for that. Mr. Barrett, you have a couple of minutes you've reserved. Do you want to use it now, or do you want to come back? I'll come back. Thank you. Thank you. Mr. McDowell. May it please the Court. Good morning, Your Honors. My name is David McDowell. I represent the Epley American General Life Insurance Company. American General asking this Court to affirm the lower court's ruling because there is unequivocal evidence that this notice was mailed. The notice was in strict compliance with Section 3211. Even if it wasn't in strict compliance, any noncompliance was immaterial. Let's go back to the strict compliance for a minute. You say it was in strict compliance. Are you saying that so long as it provides a date when the payment is due, that's good enough, even if it's the wrong date? As long as it says that it has to be received before a date that is beyond the 61-day grace period, absolutely. Can you say that a little slower so I understand what the date you're saying? As long as it still tells the insured, fairly tells the insured, that we have to receive a payment before a particular date, then it is absolutely in compliance with Section 3211. The life insurance policy here had a 61-day grace period. That 61-day grace period began on May 18th. Any payment received before July 20th, 2009 would be timely. So thereby informing the insured or the policyholder that payment had to be received before July 20th, 2009 absolutely tells the insured when payment has to be received. But now your adversary tells us that it was wrong. It could have been received as late as July 23rd or 24th or something like that. With all due respect to my esteemed adversary, he's incorrect. There is not a single New York court that has ever imposed the requirements of Section 25 or the mailbox rule on Section 3211. I've searched high and low, and the only court that I could find that's ever addressed the issue in the context of 3211 refused to apply the requirements of the General Construction Law, Section 25 to 3211. If you look at Section 25 of the General Construction Law, all it says is that if you make the payment by the next business date, it will be deemed as if it were made within the time required by the contract. Had we said that this had to be received after the grace period by July 20th or that it had to be mailed by July 20th, then we would have essentially been modifying the contract itself. No court has imposed the requirements of Section 25 on Section 3211, and we don't believe that there's any reason for the Second Circuit to be the first one to do it here. Wait a minute. You said a whole lot of things there about a lot of statutes. Did your notice literally comply with the statute? Yes. It did? Yes. Doesn't the statute, what your notice said, prior to July 20th? Correct. Is he right? Your brief talks about July 20th without the word prior to? I don't believe so, Your Honor. I don't think so. He read it to us. Did he misread it? I don't know if he misread it or not. I believe that our brief clearly sets forth the very language of the notice provision itself. And regardless of what the brief says, the notice provision says what it says and 3211 says what it says. But when you argue it, did you tell us that it was July 20th or did you talk about prior to? We talked about prior to. You did. All right. If you look, I can't remember. Now, is prior to the same as on July 20th? Prior to is not the same. It is not the same. No. Does New York in the Flint case require strict compliance? No. It doesn't? Not as it relates to what Flint said. And again, Flint is factually distinguishable because Flint dealt with a situation where the notice never told the insured at all what the consequence might be. So you think Flint says we have various degrees of noncompliance? You think that's what Flint said? No. What Flint says, and Flint does not overturn McDougal, what Flint says is that if the due date is, in our instance, July 20th, then you need to say on or before. But the grace period in this policy has the due date falling prior to July 20th. And the only way you reach July 20th is if you apply the general construction law of Section 25, which no New York court has ever done. And the district court sort of got persuaded by your effort to distinguish cases. But the two cases that this district court relied on themselves were distinguished by Flint, weren't they? No, I don't believe so. Neither Nederland nor McDougal. McDougal certainly wasn't overturned by Flint. What Flint said is that the on or before language is important to if that due date is, in our instance, July 20th. But the 61 days expired before July 20th. So by informing them that if we receive your payment before July 20th, we complied with the statutory requirements. And again, you only make a finding that July 20th is the due date if you impose on 3211 the requirements of Section 25. I just don't understand how an insurance company does this. You operate in 50 states, and understandably, they have different insurance rules. So it's difficult. But you have a big general counsel's office. So one of the things they do when they write policies in New York is first see what does New York require. All right? Everybody does that. That's right. So New York says how you have to spell out your notice in order to have a policy lapse. And you don't follow it. It's so simple to follow it, and you don't. Your Honor, and I think we do. I think that we use the language or equivalent language to indicate— No, you threw in a word that is nonconforming and which changes it by a day. Now, a day isn't much, I grant you. And if the issue was is the breach material, you'd have, I think, a very strong case. But if the issue is did you comply with New York's policy of literal compliance, I don't understand why your lawyers don't say, oh, they want it to be— they don't want us to say prior to? Yeah, we'll take out prior to. And I don't know when it went into drafting it, but, Your Honor, this does not change it by a day. The lower court said even if it did change it by a day, that change would be immaterial, and we can certainly discuss that. It would be immaterial— Right. —if we were talking about the materiality of a breach. But it wouldn't be nonconforming if New York requires strict conformance. Our notice does not change it by a day. Our notice does not change it by a day. The only way you reach a finding— How does prior to not move it up one day? Because 61 days expires on the 18th, not on the 20th. So if they complied with the language of the policy and they made a premium payment before July 20th, then they are complying with the requirements of the policy. July 20th is— I have a question. July 20th is too— Your notice— Your point is that July 20th would be too late. Correct. Okay. Well, July 20th is too late under the 61 days unless you apply Section 25, and then it's deemed to have been made before July 20th. Then it's deemed to have been made in a timely fashion. So when do you say it had to be, well, either mailed or received? What's the key date for your purposes? July 18th. The 18th. So you sent out a notice that says, what, it has to be received July 19th. Before July 20th. Before the 20th. All right. I'm giving you the benefit of as late as that is. The end of the period before 20th is the 19th. The end of the period, I believe, is the 18th, but I'm not sure. Well, according to your notice— But your notice says the 19th. Your notice says as late as the 19th, right? I don't believe it does. No, not as— But it says prior to the 20th, doesn't it? Prior to the 20th. What is the latest date prior to the 20th? July 19th. Okay. So it said, must be received no later than the 19th, didn't it? Yes. In effect. In operation effect. Correct. All right. Now you're telling us, wholly apart from New York policy, you're saying that would have been too late. No. No? I thought you just said it had to be received the 18th. Well, the 19th was a Sunday, so by operation of law, it moves to the 20th. But had we—we're not dealing with the situation, and that's the other issue here. We're not dealing with the situation. Judge Lynch, it had to be received the 18th? It does. Sixty-one days. The end of the 61-day period is the 18th. And yet you send out a notice that says it has to be received no later than the 19th. Right. How could that possibly prejudice them if we gave them more time? Well, look, I would agree with you. No prejudice, no materiality. You don't have to persuade me of any of those. I'm with you on all of those. My question, which I'm trying to get to you, is whether you are out of strict compliance with New York law. And, Your Honor, I don't—I believe the answer is no. And let me just add one addition to the argument there. Even if they win, they lose because under New York law, they are required to continue to make the premium payments that we asked for. And they never made the premium payments. 3211 does not absolve them of the responsibility to make the premium payments. It simply says that American General or any insurance company can't lapse a life insurance policy within one year of default. Here, there is no question that they had notice, either because of the May 18th notice or because of the August 4th notice, that additional premium was necessary. And they never tendered that additional period within one year. And that— If they are right that you didn't literally conform with what New York requires, then your lapse was not a valid lapse. And it never lapsed. Even if it wasn't a valid lapse, it doesn't absolve them of making the payment. And that's the Berkshire Settlement v. Ashkenazi case. In that case, the court said even if the—even if there's a change in the terms, even if the notice is improper, you still have to make the premium payments. And because in Ashkenazi and also in Brown v. Travelers, because in Ashkenazi, John Hancock had received a payment within the new extended grace period, the court found that—and it even says, by happenstance, it's fortuitous that they made the payment—found that the premium obligations had been fulfilled. But they never, ever fulfilled the premium obligations here. They had notice of the amount due. They never paid that amount due within the one year. And as a consequence, even under the language of 3211, even if the notice is not proper, under 3211, the policy is still terminated. Thank you. What do you say about that? Yeah. We sent a check that was received a few days later, and they returned— Later than what? Okay. What happened? And that gets into the— When you say later, I just want to know later than what. Let me give a timeline. Yeah. Okay. Timeline. I think I'll answer your question. Give me one second. They received two notices. They received one notice that says the $20,000, the second that says $15,000. I believe that in itself makes it confusing. And the first— There are two different payments. But how are they supposed to understand that an insurance company first says we want $22,000, and then two weeks later they say we want $15,000? But leaving that aside— Because insurance companies sometimes are entitled to several payments. And if they send you one letter that says, please pay this amount by this date, and then they send you another letter that says you owe this by this date, maybe you owe them both. Well, I believe in the context it's confusing. But leaving that aside, they send that second payment, and they get this letter back that says what they — and what they could have done is they had the policy number on it, they could have looked in their computer in a second and sent back a letter that says, by the way, $15,000 isn't enough, and make it payable correctly. You really owe us $22,000. They didn't do that. They sent back the check. Who was it made payable to? Pardon me? Who was made payable to the insured by mistaking the computer? Insured. Yeah. By the person who wrote it out. Correct. And AIG gets it. They know exactly what's happening. They get the check back. But let's address this issue. They then, within a week and a half, they get that letter, and they immediately replace the check with a $15,000 check. They payable to AIG. AIG caches the check, and then a month later rejects it and sends back that payment saying we're not accepting it because the policy lapsed. So therefore, we have made — Because the number was $15,000, and in the grace notes it said $21,000. No. But that's not why they rejected it. They said the policy has already lapsed. They dispute that that check, after it was sent back, after they said, okay, we made it payable to the — to the beneficiary of the policy, all right, we'll send it back, and you have this form saying it's not made out to AIG. Then you send it in for $15,000. Is that in compliance with anything? Let's say it's not in compliance, but we know already that they will not take any payment. They didn't take the $15,000. They said your policy has lapsed. So therefore, they've told us that it's already lapsed, and we won't take payment. We tried to make payment. And in our pleading, specifically, it says we are ready and willing to make full payment. So therefore, we have offered to pay. We've paid and got our check rejected. What more can we do? Send another check that they're going to reject? I don't care if we send a check when they told you it's lapsed. If I sent the check for $25,000, $100,000, $1 million, they're going to reject it because they told us it's lapsed. They didn't say it's not enough. They said not enough would be one thing. So therefore, we've made the tender of payment. And therefore, that is not – I believe that does not – we've qualified. I realize I'm over my time. You said they cashed your check for the $15,000? Correct. And then did they remit it to you? Correct. With a letter rejecting it. And it's in the record there. Your time has expired. Thank you. Okay. Thank you. We'll reserve decision on this case, and we'll take a vote.